# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# NORTHERN DIVISION

**LIANNE D. JUDKINS**                                                                  **PLAINTIFF**

VS.                                         No. 3:22-cv-00236 PSH

**KILOLO KIJAKAZI, Acting Commissioner,**
  **Social Security Administration**                                                  **DEFENDANT**

## ORDER

Plaintiff Lianne D. Judkins ("Judkins"), appeals the final decision of the Commissioner of the Social Security Administration (defendant "Kijakazi") to deny her claim for Disability Insurance benefits ("DIB"). Judkins contends the Administrative Law Judge ("ALJ") erred in two ways: (1) by incorrectly considering the functional effects of her fibromyalgia; and (2) by failing to properly assess her residual functional capacity ("RFC") when examining the accommodations required due to her ulcerative colitis "flare-ups." The parties have ably summarized the testimony given at the telephonic administrative hearing conducted on March 22, 2021. (Tr. 23-46). The Court has carefully reviewed the record, including the medical records, to determine whether there is substantial evidence in the administrative record to support Kijakazi's decision. 42 U.S.C. § 405(g). The

relevant period under consideration is from October 8, 2019, the amended onset date, through June 30, 2021, the date of the ALJ's decision.

*The Administrative Hearing:*

In response to questions posed by the ALJ, Judkins stated she was 54 years old, with a high school education and "some college." (Tr. 27). She was living with her husband. She said she could do some "very short-term" activities, such as laundry, if she could sit to sort and fold, driving short distances (six miles or less), and walking short distances. (Tr. 28). Judkins indicated she used a cane at times, and estimated she could lift ten pounds, but not repetitively, and could not bend or squat. Judkins had not sought counseling or therapy because she could only drive short distances and lived in a rural area, and this treatment would require her to drive a longer distance.

Judkins identified Sulfasalazine, an anti-inflammatory, as a medication she took periodically to treat her ulcerative colitis. For her fibromyalgia, Judkins relied upon Ibuprofen, Naproxen, massagers, and a TENS unit (since 2016) to address her pain. Judkins stated she had previously taken Effexor, Cymbalta, and Lyrica for fibromyalgia, none of which were effective).

Judkins previously worked as an office assistant, answering telephones, doing paperwork and scheduling. This job was a "temporary fill-in position" which she left

because it was "very, very painful" to sit for eight hours. (Tr. 30). In addition, she testified her frequent bathroom trips interfered with the job.

In response to questions from her attorney, Judkins detailed her history and symptoms of ulcerative colitis. On a normal day, Judkins experienced diarrhea "most of the time," and had to go to the bathroom within fifteen minutes of eating. (Tr. 31). She described a 2014 flare-up that required her to go to the bathroom every half hour, resulting in a loss of thirty pounds in two weeks, internal bleeding, pain, dizziness, a pounding heart rate, and an emergency room visit. Between 2014 and 2019, Judkins was not treated regularly for her ulcerative colitis although she continued to have problems. In 2019, Judkins began to see APRN Cammie Sifford ("Sifford"), who prescribed Sulfasalazine and Prednisone to counter the flare-ups.

Judkins was hospitalized in August 2019 with foot pain which prevented her from walking. Judkins began to suffer from joint pain in October 2019, and was diagnosed with fibromyalgia. Despite taking Ibuprofen or Naproxen, she suffered with random pain daily, sometimes in her hand, other times in her knee, toes, or fingers. She said the pain made it "very, very difficult for sleeping" and that she often awoke with shin splints. (Tr. 36). In addition, the fibromyalgia has brought on daily headaches, migraines every week to week-and-a-half, and a "brain fog" which affects her memory and ability to concentrate. (Tr. 37).

Judkins testified she was seen at Pocahontas Medical Center in January 2020, where she was treated for a sleep disturbance and prescribed Ambien. The Ambien was described as only partially effective (results in "a force sleep but it's not a restful sleep"), and Judkins indicated she takes it about every three nights. "[I]t's not a cure." (Tr. 39).

In addition to medications, Judkins dealt with her pain by using a hand massager, getting massages from her husband, and using hot water to relax her muscles. She estimated she could sit ten minutes before pain throughout her body and a headache would require her to get up and move around. She estimated she could stand ten minutes. She also dropped items and could lift only a few items in the short-term, such a removing dishes from the dishwasher. Judkins said her pain would preclude her from performing a sedentary job.

Charles Turner ("Turner"), a vocational expert, assessed Judkins' past work as an administrative clerk as a semi-skilled job at the light exertional level, but sedentary as it was performed by Judkins. The ALJ posed a series of hypothetical questions to Turner, first asking him to consider a hypothetical worker of Judkins' age, education, and experience, who could perform light work but could only occasionally stoop, crouch, crawl, and kneel, and who would be limited to indoor work near a restroom with flexibility when regular breaks are taken (eliminating assembly line work where

the breaks must be at a specific time). Turner responded that such a worker could perform Judkins' past relevant work. The ALJ then altered the hypothetical, adding a restriction that the worker would require more frequent breaks so that they were off task at least 15% of the workday. Turner stated such a worker could not perform Judkins' past relevant work. Judkins' attorney inquired whether work would be available if "brain fog" rendered the worker unable to complete a 40-hour work week. Turner testified no jobs would be available to such a worker. (Tr. 23-46).

*ALJ's Decision:*

In his May 3, 2021, decision, the ALJ determined Judkins had the severe impairments of ulcerative colitis and fibromyalgia.

The ALJ found that Judkins did not have an impairment or combination of impairments that met a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ noted fibromyalgia is not a listed impairment but may medically equal a listing by itself (e.g., the listing for inflammatory arthritis) or in combination with another medically determinable impairment. The ALJ found fibromyalgia did not satisfy either standard. The ALJ also found Listing 5.06 (inflammatory bowel disease) was not met.

The ALJ found that Judkins had the RFC to perform light work with the restrictions which mirrored those detailed in the initial hypothetical question posed to

Turner. The ALJ assessed Judkins' subjective allegations, finding her statements "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 16).

The ALJ summarized the medical evidence concerning ulcerative colitis, highlighting treatment notes from 2019 through April 2020 showing stable and improving symptoms. Similarly, the ALJ reviewed the medical records regarding fibromyalgia. The ALJ also noted the conservative treatment Judkins received and improvement with medication.

The ALJ considered the opinions offered by the state agency physicians, who opined in May and July 2020 that Judkins could perform the full range of light work. The ALJ deemed these opinions "generally persuasive." (Tr. 17).

Relying upon Turner's testimony that the hypothetical worker could perform Judkins' past work as actually and generally performed, the ALJ decided Judkins was not disabled. (Tr. 12-18).

*Judkins' First Claim – the ALJ incorrectly considered the functional effects of her fibromyalgia*

Judkins faults the ALJ for his emphasis on a negative rheumatoid factor test, for noting the conservative nature of treatment, and for his assessment of her daily activities. Those errors, according to Judkins, detracted from the ALJ's findings so

that substantial evidence did not support the ultimate decision.

The ALJ did note the negative rheumatoid factor test, which was performed in October 2019 by Sifford after an office visit in which Judkins reported her ulcerative colitis was "rapidly improving" but complained of foot pain, "wondering if it is possible that she has fibromyalgia." (Tr. 523). Judkins had previously complained of joint pain, myalgia, neck pain, and trouble walking at her September 2019 visit with Sifford, at which time she was prescribed Gabapentin for foot pain. (Tr. 530). August 2019 visits at Sifford's clinic (Pocahontas Medical Clinic) focused solely on the ulcerative colitis. (Tr. 533-543). Subsequently, Judkins was seen for myalgias and fibromyalgia in December 2020, when she was prescribed Savella and Baclofen, and January 2021, when she reported the prescriptions were "working well." (Tr. 680, 683). Other visits during 2020 omitted mentions of myalgias or fibromyalgia, instead dealing with follow up for ulcerative colitis and treatment of a skin lesion. (Tr. 554, 557, 559).

Viewed in the context of the treatment received by Judkins, the ALJ's mention of the October 2019 negative rheumatoid factor test is not significant. Regardless of the result of that test, the treatment records reflect that Judkins was suffering from joint pain and was treated accordingly. Her treating APRN would later diagnose her with fibromyalgia, and the ALJ found fibromyalgia to be a severe impairment. The

analysis of the ALJ did not hinge on the test result, and this was appropriate. The focus was on the joint pain, whether officially diagnosed as fibromyalgia or not, and the effect of the pain on Judkins' ability to perform work tasks. The ALJ did not err by noting, or by placing some emphasis on, the negative rheumatoid factor test.

Judkins also faults the ALJ for noting that her course of treatment for fibromyalgia was conservative. The treatment provided was a typical approach to fibromyalgia, according to Judkins, and there was not a non-conservative option to be pursued. Even assuming Judkins is correct in this regard, the ALJ's mention of conservative treatment in his discussion of her symptoms was not the primary basis for his evaluation of her fibromyalgia. Instead, the ALJ's review of the objective medical evidence was the primary focus. In particular, he stressed normal sensation and effective response to the prescribed medicines. It is also noteworthy that Judkins' complaints of fibromyalgia were addressed in the fall of 2019 but not again until December 2020, although she was seen for treatment for other reasons between those dates. To the extent the ALJ erred in deeming the fibromyalgia treatment conservative, any error was harmless in light of the other evidence and the analysis of the ALJ.

Judkins next argues the ALJ erroneously assessed her daily activities when he cited treatment notes indicating Judkins "makes trips back and forth with her husband

to Arkansas for the remodeling of an old house." (Tr. 18). Judkins maintains there was no evidence about how often these trips occurred, how long the trips would take, or what activities she engaged in regarding the remodeling. Also, Judkins argues her hearing testimony was that *her husband* was traveling back and forth to Arkansas for work.

A review of the hearing transcript reflects Judkins was in Arkansas at the time of the telephonic hearing, and she testified she lived with her husband, who "travels back and forth for work." (Tr. 28). This testimony was given on March 22, 2021. Earlier, however, in January 2020, Judkins reported to Dr. Michael Hightower ("Hightower") that she lived with her husband in Maryland and was making trips back and forth to Arkansas where they were remodeling an old house. (Tr. 545). She had reported the same information to Hightower in August 2019, about six weeks prior to the alleged onset date. In April 2020, Sifford noted Judkins "has been traveling lately." (Tr. 558). While it may be accurate that only Judkins' husband was traveling on or around the date of the hearing, it also appears that Judkins was able to and did travel during the relevant period. The ALJ did not err in observing this as one factor in evaluating her symptoms. See SSR 16-3p.

In summary, the ALJ's consideration of Judkins' fibromyalgia was supported by substantial evidence. The objective medical evidence of improvement with

medication was significant, as was the timing of her treatment. Any error in characterizing the treatment as conservative was harmless and outweighed by the other factors cited by the ALJ.

*Claim Two – the ALJ failed to properly assess her RFC when examining the accommodations required due to her ulcerative colitis "flare-ups."*

The ALJ was required to determine Judkins' RFC "based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations," *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Here, the ALJ determined Judkins could perform light work with restrictions, most notably the restriction that she was limited to indoor work near a restroom, with flexibility when regular breaks are taken. This limitation stems from her ulcerative colitis. This RFC was more limited than the RFC as determined by the state agency consultants, who opined Judkins could perform the full range of light work.

Judkins contends there was no medical evidence of record which supports the restrictions tied to her ulcerative colitis "flare-ups." A review of the objective medical evidence is helpful. Just prior to the relevant period for disability purposes, in August 2019, Judkins had a major flare-up of her ulcerative colitis. She presented to Sifford, her treating APRN, who sent her directly to the hospital for admission. She reported

to Sifford that the colitis was acute and in an increasing pattern for weeks, and that she had a large amount of blood in her stool on the day she was seen. (Tr. 533). When seen at the hospital, Judkins provided her history of ulcerative colitis, including being diagnosed with it at age 27 (25 years earlier), with a fairly uneventful course controlled with medication through the years, and with her last flare-up occurring about five years earlier. Hightower, who treated her at the hospital, diagnosed her with "longstanding ulcerative colitis with recent exacerbation" and predicted "she will have a very quick and good response to the IV steroids and we can then switch to a tapering course of prednisone." (Tr. 315). When Judkins returned to Sifford a few days later she reported no more diarrhea or bloody stool, and her only complaint was foot pain. (Tr. 529). She was "rapidly improving" the next month when seen by Sifford. (Tr. 523).

Hightower, after seeing Judkins in January 2020, indicated she "has been doing very well on her usual maintenance meds . . . right now she is doing very well . . . we had a good discussion regarding the natural history of ulcerative colitis, importance of maintenance meds, using prednisone for flare ups and try to avoid hospitalization." (Tr. 409).

Sifford recorded Judkins was "doing well at present" and "has been traveling lately" in April 2020. Sifford assessed that Judkins was stable, able to continue on her

current medication regiment, and advised her to return to the clinic in 3 months or sooner as needed. (Tr. 559-560). In December 2020, Judkins returned to Sifford with her primary complaint of myalgia and a secondary complaint of ulcerative colitis, which was "gradually worsening." (Tr. 683). Judkins denied any blood in her stool but stated the stool contained mucus. Judkins requested and received a new prescription for prednisone. Sifford deemed her condition stable. When seen in January 2021, Judkins noted she was "doing well at this time." (Tr. 680). The ulcerative colitis was described as stable and she was directed to continue with her current medication regimen. (Tr. 681).

      The ALJ found ulcerative colitis to be a severe impairment, and acknowledged that Judkins experienced flare-ups. The restriction to indoor work near a restroom was an accommodation tied to the possible flare-ups, and to her testimony that she needed to use the restroom within 15 minutes of eating. The objective medical evidence, however, does not support the view that this restriction was an error. The treatment records during the relevant period reflect some issues with ulcerative colitis, but certainly no flare-up as serious as the August 2019 problem resulting in hospitalization. It is significant that the 2019 flare-up occurred five years after the previous flare-up. It is also noteworthy that no treating physician opined that Judkins needed restrictions greater than those stated by the ALJ. The ALJ's RFC, both in

general and with respect to accommodations for her ulcerative colitis, is supported by substantial evidence.

In summary, the ultimate decision of Kijakazi was supported by substantial evidence. The Court's task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion. The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). This test is satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of Kijakazi is affirmed and Judkins' complaint is dismissed with prejudice.

IT IS SO ORDERED this 17th day of May, 2023.

_____
UNITED STATES MAGISTRATE JUDGE